

## Application for Site Plan Review

Tax Map __102__   Lot __5__

Street Address: __749 Route 3, Lincoln, NH__

Detail the nature of the use being proposed:
__wireless telecommunications facility__
__See Project Narrative__

To have an application accepted as complete prior to the Planning Board's consideration for approval, an applicant must: 1. Submit this form with Site Plan Review Checklist; 2. Provide all information required by the Site Plan Review Regulations or request a waiver and 3. Remit full payment of application fees to the Board **23 days before the regular monthly meeting**. It is strongly recommended that applicants meet with town staff and conduct a conceptual review with the planning board prior to completing an application for Site Plan Review.

The undersigned owner and/or his/her designated agent hereby submit to the Lincoln Planning Board, a site review plat dated __August 12, 2020__, entitled __Green Mountain Communications – Lincoln, NH__ and requests approval of said plat. In consideration for this approval and the privileges accruing thereto, the applicant hereby agrees:

1. To carry out the improvements as shown and intended by said plat, including any work made necessary by unforeseen conditions which become apparent during construction.

2. To post all streets "Private" until accepted by the Town and to provide and install standard street signs as approved by the Town for all street intersections.

3. To give the Town on demand, proper deeds for land or right-of-way reserved on the plat for streets, drainage or other purposes as agreed upon.

4. To save the Town harmless from any obligation it may incur, or repairs it may make, because of applicant's failure to carry out any of the foregoing provisions.

5. To make no changes whatsoever in the Final Plat as approved by the Board unless a revised site plan is submitted to and approved by the Board.

The undersigned owner may designate an agent (relative, surveyor, real estate broker, etc.) to carry out the application process and to whom all related communications may be addressed:

_____ __8/19/20__     __See letter of authorization__
Applicant's Signature        Date             Property Owner's Signature       Date
GMR Holdings, Inc.                            Greenside Tnk, LLC
702 Riverwood Drive, Pembroke, NH             PO Box 953, Lincoln, NH
Address                                       Address

_____                   _____
Phone Number / E-mail Address, if any         Phone Number / E-mail Address, if any

Revised 3/6/2014                                                            Page 1



**TOWN OF LINCOLN, NH**
Planning & Zoning Department
PO Box 39
Lincoln, NH 03251

Phone: 603-745-2757
Fax: 603-745-6743
Email: planning@lincolnnh.org
Web: www.lincolnnh.org

## Application for Waiver of Subdivision/SPR Regulations

Tax Map __102__   Lot __5__

Project Name: Green Mountain Communications Lincoln

Date: __August 21, 2020__

Location: __749 US Route 3, Lincoln NH__

Applicant: __GMR Holdings of NH, LLC__

I/We request that the Planning Board grant a waiver from the Lincoln Subdivision Regulations and/or Site Plan Review Regulations for the above named project. The sections of the regulations which I/We wish to be waived are:

Section:   Reason(s) for Waiver Request:

__Article IV-Section H(4)(a)(i)__ — See Project Narrative

__Article XIV(23)(d)__ — See Project Narrative

__Article IV-A Section J__ — See Project Narrative

Signature of Owner or Agent: _[signature]_ on behalf of GMR Holdings of NH LLC

++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++

Date Received by Planning Board: _____   Received By: _____

Planning Board Disposition:

A waiver from the Lincoln Subdivision and/or Site Plan Review Regulations for the above named project and for the following sections has been granted:

| Section: | Conditions: | | | Effective Date: |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

A waiver from the Lincoln Subdivision and/or Site Plan Review Regulations for the above named project and for the following sections has been denied:

Reason(s) for the denial: _____

Signature of Planning Board Chairman: _____   Date: _____



# TOWN OF LINCOLN PLANNING BOARD
# SITE PLAN REVIEW CHECKLIST

This checklist is intended as a guideline to assist the applicant and the Planning Board in the planning review process. The type of project proposed will determine the types of information required by the Planning Board to review a proposed Site Plan. This completed checklist must be initially submitted by the applicant as part of the Site Plan Review Application. This checklist is only a guideline. Applicants are referred to Article XIV of the Site Plan Regulations for the binding requirements unless waiver(s) are granted by the Planning Board.

Tax Map __102__   Lot __5__

Location/Street Address: __749 Route 3, Lincoln, NH__

Project Name: __Green Mountain Communications - Lincoln, NH__   Date: _____

Applicant Name: __GMR Holdings, Inc.__   Owner Name: __Greenside Ink, LLC__

|  |  | Provided | Not Applicable | Waiver Requested |
|---|---|---|---|---|
| 1. | Scale: not less than 1" = 40". | X | | |
| 2. | Submit 3 copies of blue or black line prints. | X | | |
| 3. | Date, title, north arrow and scale. | X | | |
| 4. | Name and address of the owner and applicant. | X | | |
| 5. | Name and address of the licensed land surveyor. | X | | |
| 6. | An accurate plan of the site showing existing natural features, including watercourses and water bodies, various types of vegetation, topographical features and any other features which should be considered in the site design process. | X | | |
| 7. | The type, extent and location of existing and proposed landscaping and open space areas indicating what existing landscaped and open space areas will be retained. | X | | |

|     |                                                                                                                                                                                                         | Provided | Not Applicable | Waiver Requested |
| --- | ------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------- | -------- | -------------- | ---------------- |
| 8.  | Existing and proposed topography of the site at two (2) foot contour intervals.                                                                                                                         | X        |                |                  |
| 9.  | Soil mapping units and unit boundaries.                                                                                                                                                                 | X        |                |                  |
| 10. | Flood plain identification areas.                                                                                                                                                                       | X        |                |                  |
| 11. | The location of all buildings within fifty (50 feet of the site and the location of all intersecting roads or driveways and utilities (water, sewer, electrical, cable, telephone) within 200 feet.     | X        |                |                  |
| 12. | The location of all building setbacks required by the Land Use Plan Ordinance.                                                                                                                          | X        |                |                  |
| 13. | The location of district boundaries, including wetlands.                                                                                                                                                | X        |                |                  |
| 14. | The lot area, street frontage and the requirements for minimum lot size.                                                                                                                                | X        |                |                  |
| 15. | Location of off-street parking and loading spaces with a layout of the parking indicated.                                                                                                               | X        |                |                  |
| 16. | The location, width, curbing and type of accessways and egress ways.                                                                                                                                    | X        |                |                  |
| 17. | The location of all existing and proposed deed restrictions, covenants, etc.                                                                                                                            |          | X              |                  |
| 18. | Surveyed property lines, showing their deflection angles, distances, radius, lengths of arcs, control angles, along property lines and monument locations and names of all abutters.                    | X        |                |                  |

|  | Provided | Not Applicable | Waiver Requested |
|---|---|---|---|
| 19. If the development is a subdivision, then lines and names of all proposed streets, lands and ways of easements intended to be dedicated for public use. All subdivision regulations shall apply. |  | X |  |
| 20. Plan views of all buildings, either existing or proposed, with their use, size, location and floor elevations indicated. | X |  |  |
| 21. A typical elevation view of all existing and proposed buildings indicating their height and signing. | X |  |  |
| 22. The type and location of solid waste disposal facilities. |  | X |  |
| 23. The location, size and design of proposed signs and other advertising or instructional devices. | X |  |  |
| 24. Stormwater drainage plan showing: |  |  |  |
| a. The existing and proposed methods of handling stormwater runoff. | X |  |  |
| b. The direction of flow of the runoff through the use of arrows. | X |  |  |
| c. The location, elevation and size of all catch basins, dry wells, drainage ditches, swales, retention basins and storm sewers. | X |  |  |
| d. Engineering calculations used to determine drainage requirements. |  |  | X |
| 25. The size and proposed location of water supply and sewage facilities and provision for future expansion of sewage and water facilities. |  | X |  |

|  | Provided | Not Applicable | Waiver Requested |
|---|---|---|---|
| 26. The size and location of existing and proposed public and private utility connections, including provisions for fire protection. | X | | |
| 27. The location and type of all existing and proposed lighting for all outdoor facilities. | X | | |
| 28. Copies of all applications submitted for applicable state approvals and permits. | | X | |
| 29. Performance Guarantee or Bond. | | | X |
| 30. Illustration of effect on pedestrian and automotive circulation. | | X | |
| 31. Illustration of fencing, walls and buffers | X | | |
| 32. If waivers for non-compliance to DOT construction specifications for roads, parking, streets, drainage and bridges will be required. | | X | |

This checklist finalized and submitted by:

_____   Date  8/21/2020
Signature

Jonathan Springer, Esq.
Name (Printed or Typed)

**Office Use Only:**

Date Received: _____  _____   Date of Board Meeting: _____
                                Initials

Revised 2003                                                           Page 4

06/06/2020 07:36  NO.373 #001

*D.R. Landry & Sons Property Services LLC. 749 Route 3 Lincoln NH 03251*

June 1, 2020

Re: **Letter of Authorization**

    Applicant: **GMR Holdings of NH, LLC**

    Site Address:     **749 Route 3, Lincoln, NH**
                           **Tax Map 102  Lot 5**

To Whom it May Concern:

As the owner of the above referenced property, permission is hereby granted to GMR Holdings of NH, LLC and it's agents to file all permitting applications necessary to gain all required approvals or permits for a wireless communications facility and related improvements from the Town of Lincoln, the State of New Hampshire and any other governmental authorities having jurisdiction over the proposed development.

Please contact me with any questions regarding this authorization.

Sincerely

*[signature] Donald I. Landry  D.I.L.*
Donald I. Landry - Member

Greenside Ink, LLC
O: (603) 745-3233
C: (603) 252-3233

PROJECT NARRATIVE

The Property is located at 749 US Route 3, Lincoln, NH ("the Property") and is just over one acre in size. It is owned by Greenside Ink, LLC. The Property is used by the owner to operate a landscaping business. The property is a triangular shape, between Route 93 and Route 3.

The Applicant GMR Holdings of NH, LLC ("the Applicant") seeks to install, operate and maintain a personal wireless service facility, also known as a wireless telecommunications facility (the "Facility") on the Property. (This Narrative is submitted as part of the application for this Project and is incorporated into the application form as if fully set out therein.) The proposed Facility consists of a self-supporting monopole tower, with the top of the monopole 120' above ground level ("AGL"). Antennas and other equipment will be attached to an antenna mount which in turn is attached to the monopole; the centerline of the antennas will be at 116' AGL. The antennas will be connected via cables running to equipment cabinets located within a rectangular leased area, which will be a fenced compound at the base of the tower. The leased area is roughly 40' x 38' x 40' x 52' along its edges. Access and utilities to the Facility will be from an existing driveway and utilities from US Route 3. The Applicant's proposed Facility is shown on the plans submitted with the application and identified as **Exhibit 1** (the "Plans").

The Property is located in the General Use ("GU") zoning district. New tower construction is permitted by right in the GU district under Article VI-A Section F of the Town of Lincoln's Land Use Plan Ordinance ("the Ordinance".)

In addition to site plan approval, the Applicant is seeking a conditional use permit pursuant to Article IV-A, Section F (4) to increase the allowed height of 100' to 120'.

The Applicant seeks the following waivers:

1. From Article IV-4, Section H (4)(a)(i), which states that "Towers shall be located within the tower lot so as to provide a fall zone free of any structures equal to 125% of the height of the tower.
2. From Site Plan Review Regulation Article XIV (23) (d), which requires engineering calculations used to determine drainage requirements.
3. Article IV-A, Section J (as a condition of acceptance only; the Planning Board shall require the applicant to post adequate surety for the costs of maintenance, remit repair or removal thereof. The amount informed of the surety shall be determined by the Planning Board.")

The wavier requests are addressed in more detail below.

### I.  Background

The Applicant provides site development services for the telecommunications industry. The Applicant has been involved in the development of numerous sites for wireless

1

telecommunications carriers as well as municipalities throughout New Hampshire. It is the Applicant's policy to design and construct facilities which encourage co-location by accommodating additional wireless carriers in order to reduce the amount of new tower facilities. AT&T is the initial telecommunications carrier to use the Facility. AT&T is licensed by the Federal Communications Commission ("FCC") to construct and operate a wireless telecommunications network in various markets throughout the country, including the State of New Hampshire and Lincoln, in particular. One of the key design objectives of AT&T's systems is to provide seamless coverage without significant gaps in coverage or dead spots. Such a system requires wireless facilities, such as the proposed Facility, to be located fairly closely together, depending on the location of existing and proposed facilities in the surrounding area. The technology operates on a line-of-sight basis, requiring a clear path from the facility to the user on the ground. This dynamic requires that the antennas be located above the tree line and in locations where the signal is not obstructed or degraded by other buildings or by topographical features such as hills and mountains.

## II. RF Coverage Determination / Site Determination

AT&T has an FCC License to provide personal communication services ["PCS"], which operates by transmitting low power radio signals between subscribers' wireless devices and service providers' antennas mounted on towers, poles, buildings, or other structures. Proper transmission and receipt of wireless communication signals requires antennas to be elevated in order to provide an unimpeded line of sight to end users' telecommunications equipment.

Antennas feed signals through electronic devices located in equipment cabinets near the antennas, and then connect calls to regular telephone lines. The area covered by each set of antennas is referred to as a "cell". If there are an insufficient number of sites, or if there are particular locations where such sites do not exist, then users either will not be able to make or receive calls, or calls in progress may be dropped. In order for a network to provide reliable wireless service to subscribers, there must therefore be a sufficient number of properly placed cell sites to maintain effective, reliable, and uninterrupted service – comparable to a honeycomb pattern.

Thus, in order to have a functional PCS wireless network, it is critically important that each cell be located in specifically prescribed areas. A number of factors determine the distance between cell sites including, but not limited to, coverage objective and distance to the objective, topography, physical obstructions, foliage, antenna height, operating frequency, and line-of-sight. Accordingly, to be a viable cell site, a structure and its location must be sufficiently elevated to send and receive signals, as well as close enough to the coverage objective and other sites to have a properly functioning network.

The coverage objective for the proposed monopole is the heavily travelled corridor of I-95 and US Route 3, as well as Franconia Notch State Park and the surrounding roads, businesses and neighborhoods in the proximity of the Property. Currently, AT&T is experiencing a significant gap in converge in that area. This Facility is also planned to be part of the FirstNet responder network. This network is a unique public/private partnership between the federal government and AT&T, which grew out of the 9/11 terrorist attack. FirstNet is a nationwide, wireless broadband network dedicated to first responders such as fire, police, EMS, 911

operators and the like. FirstNet will be important not only for terrorist attacks (which unfortunately in this day and age can happen anywhere) but also natural disasters such as hurricanes, floods, and the like. In such catastrophes, and as demonstrated by the events of 9/11, phone communications can become jammed and overwhelmed. Further, there is no direct communication link or network between all of the local, state and national first responder, so it is extremely difficult in getting all of the various first responders to be able to communicate with each other directly.

FirstNet will allow the first responders to have their own network and to communicate using voice, video and data transmission. FirstNet will allow first responders in a small New Hampshire town such as Lincoln to communicate directly with other local first responders, and also with state and national first responders.

The Applicant has retained C Squared Systems, LLC to prepare the radio frequency ("RF") report and RF plots. The report, including the plots, is attached as **Exhibit 2**. As can be seen from that report the Facility will provide RF coverage not only to the key roadways of I-93 and US Route 3, but also to Franconia Notch State Park and the surrounding roads, businesses and neighborhoods in the proximity of the Property. Without the Facility, there will be significant gap in service for AT&T in that area.

As shown by Exhibit 6 to the RF report, AT&T's closest neighboring sites are as follows: (i) in Lincoln, 3.1 miles away (33 Brookline Road, on-air, at an antenna height of 107'); (ii) in Woodstock, 4.7 miles away (12 Grandview Lower Road, on- air, antenna height of 167'); (iii) Easton, 7.3 miles away (3 Lost River Road, under construction, antenna height of 150'); and (iv) Franconia, 4.8 miles away (9 Franconia State Park, on-air, a roof top installation, antenna height of 60'.) Not shown by Exhibit 6 due to the scale and distance is the AT&T site is in Bartlett (44 Kearsarge Street, on-air, a smokestack installation, antenna height of 55'). Due to the existing topography and distances, none of those AT&T sites can provide RF coverage to the gap in coverage. (The area's topography is shown by Exhibit 5 to the RF report.)

The Applicant has submitted, as **Exhibit 3,** an alternative site analysis regarding other sites it considered in the town of Lincoln.

### III. The Facility

As shown on the Plans, The Applicant has leased from the property owner a small portion of the Property ("the Site.") Within the Site will be the fenced base compound. The Site will be accessed by an existing paved driveway off US Route 3. The driveway and utilities will be located as shown on the Plans. There is an existing utility pole currently sitting where the proposed compound is to go, so that pole will be relocated to outside the compound, also as shown on the Plans. The Site will house the 120'monopole. AT&T's antennas will be mounted at an antenna centerline height of 116' at the top of the tower. Cables will run to the base of the tower, where there will be equipment situated. AT&T's equipment will be located in a small, 6'x6' walk-in cabinet placed upon a concrete pad. A spec sheet and representative picture of

such a cabinet are attached as attached as **Exhibit 4.** There will also be an emergency generator located on that pad.

Because the Site is unmanned, there is no need for water or sewer. The only utilities needed are telephone and electric (standard 120-volt electrical power), and these can be easily run from existing services off Route 3. The monopole itself will not be lit. A six-foot-high chain link fence, topped with three strands of barbed wire, will secure the Site. There is no pedestrian traffic generated, and the only vehicular traffic after construction will be one or two trips per month per carrier by a technician in an SUV or similar vehicle. There will be a small parking/turnaround area immediately adjacent to the compound which will provide adequate parking space, when needed, given the low vehicular traffic. The Facility will comply with all applicable local, state and federal safety codes.

The Plans contain detailed erosion and sedimentation control measures. Natural contours will be followed wherever possible. Erosion control measures, as shown by Sheet Z-6 of the Plans, shall be implemented along the construction areas for the proposed Facility location. Natural and man-made drainage ways and outlets shall be protected from erosion. The Facility, as constructed and operated, does not contribute to drainage or erosions issues, especially given the small size of the Site.

As required by Article IV-A, Section I (2)(vi), the Applicant has designed this Facility to allow for the maximum allowance of co-location upon the monopole. The proposed Facility will be structurally capable of hosting three other carriers in addition to AT&T, for a total of 4 carriers. Each future co-locator will require 10 feet of separation between the center lines of the antennas, so the additional co-location elevations would be: 106 feet, 96 feet, and 86 feet. Further, the Applicant is submitting a letter agreement stating that it agrees to supply available co-location in the future to other carriers for reasonable fees and costs. **See Exhibit 5.**

The Applicant has also submitted a Radio Frequency Emissions Analysis Report. **See Exhibit 6.** The report concludes that the AT&T antennas and equipment will be well below the FCC's maximum permissible levels, and in fact, the total radio frequency emissions from the AT&T operation will be only 4.80% of the allowable FCC limit for General Population.

### IV. Compliance with Ordinance's Standards and Requirements

Section H sets out the general standards for both conditional use permits and site plan review. The Applicant addresses these standards as follows:

Section H(2)(a). In accordance with this section, the monopole is proposed to have a galvanized steel finish. The Applicant will be happy to speak with the Planning Bard if the Planning board wishes a neutral color instead of the galvanized steel finish.

Section H(2)(b). In accordance with this standard, the materials, colors, screening and landscaping will blend the base facilities with the natural setting and built environment. There is no "service road" proposed, as the Applicant will be using the existing driveway.

4

Section H(2)(c). This section is not applicable.

Section H(2)(d). In accordance with this section, the proposed monopole shall not be artificially lighted. The only lighting at the Facility will be a small, standard light bulb (generally, 100 watts or less) to provide illumination for equipment shelter. That lighting will only be in use when there is a technician at the facility.

Section H(2)(e). The tower shall not contain any permanent or temporary signs or other graphic representations. There will be small signs on the base equipment identifying the Applicant and AT&T (and future co-locators) as the case may be, for informational purposes. An example of such a sign is attached as **Exhibit 7.**

Section H(3). This section states that all towers and antennas must meet the FAA, FCC and any other federal standards and regulations. The Facility will do so.

Section H(4)(a)(1). This set back requirement creates a fall zone equal to 125% of the height of the tower; within that fall zone, there can be no structures. As shown by the Plans, the only structure within the 150' fall zone for the facility is the commercial building owned by the landowner; the Applicant is seeking a waiver from this provision. The industry has erected scores of these monopoles throughout New Hampshire in the past fifteen years, and, to the best of the Applicant's knowledge, there has not been a single failure anywhere in the State, even during the worst windstorms, ice storms or other severe weather conditions. Further, the Applicant is unaware of any occurrence of loss or damage from falling ice, snow, equipment or other objects from a monopole happening anywhere in the State. Indeed, such towers have been built very close to other structures and roadways, without a fall zone equal to or greater than tower height. A few examples are the towers in Greenland, NH and Dover, NH which are within tower height of the travel portion of Route 95 and Route 16, respectively.

Section H(4)(a)(ii). As shown by the Pans, the tower and all accessory facilities shall comply with the minimum zoning district set back requirements (which is a 15' front\rear\side setback).

Section H(4)(a)(iii). In accordance with this standard, the proposed Facility is not located within one quarter mile of any existing tower that is over 100' in height.

Section H(4)(b). In accordance with this section, the Facility is enclosed by security fencing not less than 6' in height. It should be noted, the Applicant is also proposing a retaining wall which will be subject to the four-foot retaining wall requirements of the Town of Lincoln.

Section H(4)(c)(i). This section requires a buffer of planted materials that screens the view of the tower compound from adjacent residential properties. In this case, there is no adjacent residential properties. However, the Applicant is proposing landscaping as shown by the Plans, and is also retaining natural vegetation wherever possible.

Section H(4)(d). The Applicant has submitted the Plans and additional information regarding the construction of the tower and antennas. The Applicant respectfully submits that these demonstrate the Facility can be safely installed and maintained.

Section H(4)(e). Storm Water Management Ordinance. A formal stormwater management report is not necessary here because the project does not disturb 15,000 square feet or more or fifty percent or more of the square footage of the lot, pursuant to Article III of the Town's Stormwater Management Ordinance.

Section I(2)(a). In accordance with this section, the Applicant has submitted the following: All information required by RSA 12-K:3; a scaled plan in accordance with the site plan review regulations, a scaled elevation view; topography; radio frequency coverage; tower height requirements; set backs; drives; parking; fencing; landscaping and adjacent uses up to 200 feet away. All of this information is shown on the Plans, except for the radio frequency coverage which is shown by the RF report and the RF plots. A copy of the RSA 12-K letter to the State, which includes a copy of AT&T's license, is attached as **Exhibit 8.** Attached as **Exhibit 9** is a map showing the existing tower locations, as reflected in the FCC database, within two miles of the town's borders.

Section I(2)(b)(i). In accordance with this section, the Applicant has submitted the Radio Frequency Emissions report.

Section I(2)(b)(ii). National Environmental Policy Act (NEPA). The Applicant is submitting one copy of the draft NEPA to the Planning Board with this application; the draft is over 100 pages long. The Applicant is submitting fifteen copies of the updated draft summary as part of this Application, as **Exhibit 10**. As can be seen from the summary, it has already been determined that: (1) the Facility is not in an officially designed wilderness area; (2) it is not in an officially designated wildlife preserve; (3) it is not going to affect listed threatened or endangered species or critical habitats; (4) it will not adversely affect National Register of Historical Places or eligible structures or areas; (please note, a letter from the New Hampshire Department of Historic Resources dated August 7, 2020 is submitted as part of Exhibit 9, stating that no historic properties will be affected by the undertaking); (5) the facility will not be located in a flood plain; (6) the construction of the facility will not involve a significant change in surface features not will wetlands be impacted by the construction of the site; and (7) there will be no high intensity white lights which affect the area surrounding the tower.

The one open item on the draft NEPA deals with Indian religious sites. As can be seen from the NEPA summary, the Applicant's representative stated that there were six tribes contacted; all of them were contacted several times in order to try to get a response. None of the tribes responded. Due to the passage of time, pursuant to the appropriate FCC regulation, certain of the tribal reviews are therefore considered completed, with no adverse response. Other time frames are still pending. However, as can be seen, most of the tribes are not located anywhere near Lincoln, New Hampshire, and it is highly unlikely that any tribes will have any response, given the distances involved and the already developed nature of the Property.

Section I(2)(b)(iii). In accordance with this section, the Applicant has submitted the inventory of existing towers.

Section I2(b)(iv). In accordance with this section, the Applicant has shown that there is no existing and available structures upon which AT&T can locate its antennas to provide RF coverage to the significant gap in coverage. As stated previously, AT&T's existing sites (including the site currently under construction in Eaton) are too far away and/or are blocked by the topography to provide RF coverage to the significant gap in coverage.

Regarding the conditional use permit for the increase in height, the Ordinance states as follows:

> Pursuant to Article IV-A, Section F (4), the maximum height for any telecommunications tower shall be 100 feet. That height limit may be increased by the Planning Board by approval of a conditional use permit if the board affirmatively finds (a) the intent of the ordinance will be preserved, (b) a modification is reasonably necessary and appropriate to further the purposes of this Article, and (c) a modification is necessary to allow for the provision of telecommunication service in the areas of the community affected.

The Applicant meets these requirements as follows:

(a) The purpose of the ordinance, as set out in Article II is to guide and protect the development of Lincoln, to promote the health, safety and general welfare of its residents, to protect the value of property and to prevent the overcrowding of land. In this regard, it is important to realize that the Applicant is siting the monopole on a "low spot" on the Property. The Applicant could move the proposed monopole to the top of the knoll immediately to the south, a distance of perhaps 60 feet or so. In so doing, the Applicant would gain approximately 20 feet in height, meaning the Applicant could use a 100 ft monopole. However, in so doing, the Applicant would be forced to remove some large trees; as seen by Sheet Z-3, there is a 75 ft hemlock, a 70 ft hemlock and a 60 ft. maple, all of which are currently being retained, but which would have to be removed. Those trees provide good tree coverage/visual coverage, for the monopole. Allowing the Applicant an additional 20 ft. in height, at the proposed location, means that the top of the monopole would be roughly the same as if the Applicant moves the monopole slightly to the south, at the compliant height. Thus, by this proposal, the top of the monopole is roughly at the same height (given the difference in the ground elevation), while retaining significant tree coverage.

(b) The additional height is reasonably necessary and appropriate to further the purposes of the Article. The purposes of Article IV-A, regarding the height issue, are to reduce adverse impacts including impacts on aesthetics, environmentally sensitive areas, historically significant locations and flight corridors. See Article IV-A, Section A (3)(b). Further, subsection (c) of that section encourages co-location. The Facility addresses all of these concerns. It is important to keep in mind, the Applicant is permitted a height of 100 feet by right. Accordingly, the Applicant is only asking for an additional 20 feet of height. This additional

height will not adversely impact any environmentally sensitive areas, historically significant locations, or flight corridors. It will also not impact the aesthetics of the area. Allowing the 20 feet additional height will also provide for additional co-location spots on the tower.

(c) A modification is necessary here to allow for the provision of telecommunications in this area. The requested additional height has little if any impact on any aesthetics or other concerns. However, it will provide AT&T the ability to provide RF coverage to a significant gap in coverage, and will allow additional co-locators to use this Facility as well.

Finally, at the conceptual hearing, the issue of the scenic by-way was raised. When considering the state's scenic by-way program as established under RSA 238:19, it is important to recognize several key facts. First, RSA 238:24 states that highway sections which have no scenic or cultural value and which are adjacent to property that is used for intensive, commercial or industrial purposes can be removed from the designated by-way. "Intensive" commercial or industrial purposes means an area containing more than five commercial or industrial activities within one continuous mile. Further, RSA 238:22 expressly states that the designation of a road as a scenic by-way shall not affect the operation, maintenance and expansion of existing public utility lines and facilities, or be construed to require any public utility to install any of its lines of facilities under ground.

These two sections clearly show that the State understands that even a scenic by-way has to occasionally be subject to the realities of modern life. In this case, the Property is in a section which, if not "intensive" as defined by the statute, is clearly not a pristine area untouched by commercial or industrial development. While is it true that such towers technically may not be "public utility lines and facilities" protected by RSA 238:22, the practical needs and necessities and the practical realities, are the same.

Further, if one views the official map of the scenic and cultural by-way at issue here, it is worth noting that there are many towers along Route 106 from Laconia to Pembroke, Warren, Rumney, and many other communities up Route 25 and Interstate 93, around Lake Winnipesaukee, and along Route 16 from Wakefield to Middleton.

SITE PLAN REVIEW REGULATIONS

Article XV – Site and Building Design Requirements

Architectural Requirements.

The Applicant believes that a reasonable reading of the Architectural Requirements shows that these requirements pertain primarily to the buildings, and not to the equipment shelter proposed by the Applicant. The equipment shelter is small, will be hidden from view by the fence and by the landscaping and will be of a neutral color. Any lighting will be low level lighting and will be shielded.

Parking.

The Ordinance does not identify any required number parking spaces for this type of project. As can be seen from the Plans, there will be ample parking on the existing paved parking lot, just outside the compound, which will be sufficient for the limited traffic and parking associated with this type of use.

Landscaping.

The Applicant is proposing the landscaping as shown by the Plans, which will help screen the equipment compound from adjacent properties, the public highways and elsewhere on the property itself. The Applicant will be happy to speak to the Planning Board about additional landscaping, if necessary.

Pedestrian and Automotive Circulation.

There will be no pedestrian traffic generated by this project. The only motor vehicle traffic, after construction, will be one or two trips per month per carrier, in a passenger vehicle or SUV type vehicle. The existing paved driveway and parking lot on the site can easily handle this traffic.

Safety.

Once again, the existing driveway and parking lot on the Property is more than sufficient to allow access to the facility by emergency vehicles if necessary.

Equipment and Service Areas.

There are no loading areas, or service areas, called for by the Facility.

Fencing Walls and Buffers.

The Facility is located on a lot which is already developed, and hosting a commercial use. The Applicant is proposing a chain link fence for security. The existing vegetation will be retained to the greatest extent possible, supplemented by the Applicants proposed landscaping.

Drainage and On-Site Waste and Sewerage and Disposal Systems.

The Facility does not produce any waste disposal or sewerage disposal issues. Given the small footprint of the Facility, and the minimal changes to the grading, there will be little if any interruption to the existing flow of storm drainage.

Construction Requirements.

The Applicant is not proposing any roads, new parking, streets, drainage or bridges, and therefore believes this section is inapplicable.

WAIVER REQUESTS

The Applicant seeks a waiver from the "fall zone" requirement. In particular, the setback requirements states: "Towers shall be located within the tower lot so as to provide a fall zone free of any structures equal to 125% of the height of the tower."

Pursuant to Article IV-A, Section L, (2), the Planning Board may grant a waiver from the strict application of the requirements of the Article where the Planning Board finds, on the probability of evidence presented to it, with the burden upon the applicant, that: (a) strict adherence to the requirements of the ordinance is not required to effectuate the purposes of the ordinance; (b) strict compliance would create practical difficulty and unnecessary inconvenience; and (c) strict compliance could potentially cause a conflict with the Telecommunications Act of 1996 and FCC regulations promulgated thereunder.

In this case, with the proposed tower height of 120 feet, the fall zone is 150 feet. The only structure within that 150 foot radius is the commercial building owned by the landowner. No other structures are located within that fall zone. As can be seen from Sheet Z-4, the motel across US Route 3 is 217 feet from the compound. The existing residential house to the south is 234 feet from the compound. Attached as **Exhibit 11** is a letter from the property owner recognizing that the building is within the fall zone and consenting to the waiver

The waiver should be granted because it meets all of the requirements. First, assuming that the purpose of the fall zone is to protect third party landowners, that purpose is met here. Clearly, the landowner who has signed the lease with the Applicant should be free to enter into such a lease and free to consent to the waiver. Further, strict compliance would create the practical difficulty of denying an otherwise compliant application whereby the land owner has no objection to the project or to the waiver. Finally, the purpose of the Telecommunication Act and the FCC regulations is to remove barriers to the zoning and construction of these types of facilities. A strict interpretation and application of the fall zone here would create such a barrier.

The Applicant seeks a waiver from Site Plan Review Regulation Article XIV (23) (d), which requires engineering calculations used to determine storm water drainage requirements. The Town's Stormwater Management Ordinance requirements do not apply to this application, as the development at issue does not disturb 15,000 sq. ft. or more, or 50% or more of the square footage of the lot. In this case, the area of disturbance is only 2,898 sq. ft. (+/_) which represents 6.36% of the lot area. The compound, once completed, will be virtually flat, and will not significantly interfere with, or increase, stormwater drainage. See, Sheet Z-6 of the Plans. The waiver should be granted because it meets all of the requirements. First, the purpose of this requirement is to protect from storm water drainage problems and excessive run off. Here, given the small foot print of the compound and because the compound, once completed, will be virtually flat, it will not significantly interfere with, or increase, storm water drainage. Thus there is no need for engineering calculations in the Applicant's opinion. The requirements would create substantial expense with little or no return.

10

The Applicant also seeks a waiver from Article IV-A, Section J, as a condition of acceptance of the application as complete, of the requirement to submit a bond. This waiver is sought as a condition of acceptance only; in the event the Project is approved the Applicant believes this can be handled as a condition of approval.

The town regulations state that the amount of the bond is ultimately determined by the Planning Board. See, Ordinance, Article IV-A, Section J (as a condition of approval; the Planning Board shall require the applicant to post adequate surety for the costs of maintenance, remit repair or removal thereof. The amount informed of the surety shall be determined by the Planning Board.")

There is no prejudice to the Town or to the public in handling the bond this way, but requiring the Applicant to submit a bond might cause the Applicant to incur significant expense with no return if the Project is not approved. The Applicant therefore requests that any bond requirement be deferred until the application has been deemed complete and the approval granted, and be done as a condition of approval.