UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

GMR Holdings of N.H., LLC,
     Plaintiff

     v.
                                         Case No. 21-cv-117-SM
                                         Opinion No. 2021 DNH 173

Town of Lincoln, New Hampshire,
     Defendant

**O R D E R**

GMR Holdings was retained by AT&T to locate, design, and construct a wireless telecommunications facility to eliminate a cellular service coverage gap in Lincoln, New Hampshire.  After extensive research and testing, GMR settled on an appropriate site at which it proposed to construct a 120-foot monopole tower and a small equipment compound.  Although construction of the tower on that site is a permitted use under the Lincoln zoning ordinance, GMR still needed permission from the town's planning board before it could proceed.  In particular, GMR had to secure a "conditional use permit" to increase the height of the monopole by 20 feet above the permitted limit of 100 feet.  It also needed a waiver of a zoning provision that requires a "fall zone" (free of any structures) equal to 125 percent of the height of the tower.

After conducting public hearings on the matter, the Town's planning board voted to deny GMR's application for site plan review, its request for a conditional use permit to increase the height of the tower, and its request for the fall-zone waiver. This litigation ensued.

In its complaint, GMR advances two claims: first, that the Town's denial of the authorizations necessary to construct the wireless communications facility amounts to an effective prohibition of personal wireless service facilities in the area; and, second, that the planning board's decision was not supported by substantial evidence - all in violation of the Telecommunications Act of 1996, 47 U.S.C. § 332(c)(7)(B).  GMR seeks an order "mandating that the Town and the Planning Board grant approval of the Application and all other permits and approvals necessary to construct, maintain and operate the facility at the Property."  Complaint (document no. 1) at 14. Pending before the court are the parties' cross-motions for summary judgment.

For the reasons discussed, GMR's motion for summary judgment is granted and the Town's motion for summary judgment is denied.

## Standard of Review

When ruling on a motion for summary judgment, the court is "obliged to review the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor." Block Island Fishing, Inc. v. Rogers, 844 F.3d 358, 360 (1st Cir. 2016) (citation omitted). Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In this context, a factual dispute "is 'genuine' if the evidence of record permits a rational factfinder to resolve it in favor of either party, and 'material' if its existence or nonexistence has the potential to change the outcome of the suit." Rando v. Leonard, 826 F.3d 553, 556 (1st Cir. 2016) (citation omitted). When objecting to a motion for summary judgment, "[a]s to issues on which the party opposing summary judgment would bear the burden of proof at trial, that party may not simply rely on the absence of evidence but, rather, must point to definite and competent evidence showing the existence of a genuine issue of material fact." Perez v. Lorraine Enters., 769 F.3d 23, 29–30 (1st Cir. 2014). In other words, "a laundry list of possibilities and hypotheticals" and "[s]peculation about mere possibilities, without more, is not enough to stave off summary judgment." Tobin v. Fed. Express Corp., 775 F.3d 448, 451–52

(1st Cir. 2014).  See generally Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 249 (1986).


## Background

AT&T retained the plaintiff, GMR Holdings, to locate and
develop a wireless telecommunications site in Lincoln, New
Hampshire.  AT&T seeks to remedy a gap in its wireless services
in the area and to extend its "FirstNet Responders" network – a
nationwide broadband network dedicated to first responders.
Specifically, AT&T wishes to provide wireless coverage within a
service gap that currently straddles two heavily traveled
highways in Lincoln - Interstate 93 and U.S. Route 3 (Daniel
Webster Highway) - and extends to Franconia Notch State Park and
surrounding roads, residences, and businesses.


As part of the process of locating a suitable site on which
to construct the necessary wireless facilities, GMR prepared a
radio frequency ("RF") report which shows that "much of Lincoln
is without reliable [wireless] service."  Affidavit of Martin
Lavin (document no. 13-4) at para. 5-9.  See also RF Report
Proposed Wireless Facility (document no. 13-4) at 7-14.  Mr.
Lavin, an electrical engineer who specializes in the preparation
of radio frequency reports, explained:

> [F]or wireless communications technology to be
> successfully operated, the antennas must be located
> above the tree line and in locations where the signal
> is not obstructed by other buildings or by
> topographical features such as hills and mountains.
> The geographical area covered by each set of antennas
> is referred to as a "cell."  If there are particular
> locations where such sites do not exist, then users
> either will not be able to make or receive calls, or
> calls in progress may be dropped.  In order for a
> network to provide reliable wireless service to
> subscribers, there must therefore be a sufficient
> number of properly placed cell sites to maintain
> effective, reliable, and uninterrupted service.

Lavin Affidavit at para. 4 (emphasis supplied).  With the
benefit of the RF report, GMR began looking for sites that might
serve as viable locations for the proposed tower.  For each
potential site, GMR had to consider factors like: the local
topography; the distance to existing wireless towers; the
location of the property within the existing coverage gap; the
site's access to public utilities; ease of vehicular access to
the site; whether the site provided adequate space for parking
service vehicles; and, of course, whether the site's owner was
willing to allow construction of a communications tower on the
property.

Additionally, if possible, GMR had to operate within the
bounds defined by the Town's zoning ordinance.  Of the seven
zoning districts in Lincoln, only two permit the construction of
new cell towers: the Small Business District and the General Use

District.  See Lincoln Land Use Planning Ordinance (the

"Ordinance") (document no. 13-6) at 9.  So, GMR began its search

by looking for locations within those two zoning districts.

Eventually, it identified five sites on which it might construct

a new wireless tower to address the gap in wireless service –

each of which was within the permitted zone, close to the

intersection of Interstate 93 and Route 3, situated at an

adequate elevation, and within the service gap.  Two of those

sites were eliminated after the owners declined to lease space

for the construction of a wireless tower.  A third was rejected

because it is a residential property.  And, the fourth, which

was occupied by a motel, was likewise rejected.  See generally

Affidavit of Peter Cooke, Project Manager for GMR (document no.

13-2) at paras. 9-10.  See also Alternative Site Analysis,

Exhibit 3 to Project Narrative (document no. 13-2) at 20-22.


    Mr. Cooke explained that GMR decided that the property

located at 749 Daniel Webster Highway (U.S. Route 3) and owned

by Greenside Ink, a landscaping business, would be the best

location for its proposed facility.

        First, it is in the [General Use] district so it is
        one of the few zones in Town where new tower
        construction is allowed.  Second, it is used for a
        commercial business.  Third, it has better ground
        elevation than the motel.  Fourth, it has better tree
        cover which provides a better opportunity to screen

the proposed tower.  Finally, it has an existing
access driveway, parking area and utilities, all of
which can be utilized for the facility.

Cooke Affidavit at para. 10.  GMR negotiated a lease with

Greenside Ink for a portion of its property and began the

process of designing the wireless facility.  That facility would

include a fenced equipment compound to hold the base equipment

and a monopole tower to hold AT&T's cellular antenna (as well as

antennae from other cellular service providers who might be

interested in co-locating on the tower).


GMR then determined that the Greenside Ink property

presented two possible locations for its monopole tower.  One,

where GMR ultimately proposed to locate the tower, and the other

approximately 30 to 50 feet away on a small hill (referenced

throughout the parties' papers as the "knoll").  See Second

Affidavit of Peter Cooke (document no. 19-2) at para. 2.  The

knoll is about twenty feet higher in elevation than the proposed

tower location and contains a stand of mature trees, including a

75 foot hemlock, a 70 foot hemlock, and a 60 foot maple.

Project Narrative (document no. 13-2) at 7.  In determining

which location was preferable, GMR was forced to reconcile two

conflicting (at least in this case) provisions of the Ordinance.

First, the Ordinance provides that, "Existing mature tree growth

and natural land forms on the site shall be preserved to the maximum extent possible." Ordinance, Section H(4)(c)(iii). But, absent permission from the Planning Board, the Ordinance also limits the height of telecommunication towers to 100 feet above ground level ("AGL"). Id. at Section F(4).

So, while locating the tower on the knoll would allow GMR to gain 20 feet in elevation – thereby allowing it to construct a 100-foot monopole (which is a permitted use) – GMR would also have to remove a substantial number of mature trees. That was something the Ordinance strongly discouraged and the abutting landowner emphatically preferred to avoid. See generally Cooke Affidavit at para. 7. On the other hand, if GMR were to construct the tower in the proposed location, no mature trees would have to be cut. But, because of the loss in elevation, a 120-foot monopole would be required. That, in turn, would require GMR to obtain a "conditional use permit" to exceed the Ordinance's 100 foot limit. Ordinance, Section F(4).

Additionally, before it may construct a tower at the proposed site, GMR must also secure from the Planning Board a "waiver" from the Ordinance's so-called "fall zone" requirement, which provides that: "Towers shall be located within the tower lot so as to provide a fall zone free of any structures equal to

125% of the height of the tower."   Ordinance, Section
H(4)(a)(i).   In this instance, then, strict application of the
fall zone requirement would require GMR to locate a 120 foot
monopole more than 150 feet from any structures.   In other
words, the tower would have to be the only structure on a
circular parcel of property encompassing more than 1.6 acres of
land.   See Minutes of November 11, 2020 Planning Board Meeting
(document no. 13-6) at 52.   Although there are no structures on
abutting properties that are within 150 feet of the proposed
tower, Greenside Ink (the property owner) does have an existing
commercial building within about fifty feet of the base of the
proposed tower.   Hence the need for the waiver of the fall zone
requirement.

Parenthetically, the court notes that while GMR could have
avoided the need to obtain a conditional use permit to exceed
the maximum allowed tower height if it were to locate the
facility on the knoll, it would still need to secure the
Planning Board's waiver of the fall zone requirement: a 100-foot
tower built on the knoll would be less than 125 feet from
Greenside Ink's maintenance building (i.e., 125% of a 100 foot
tall monopole).   Moreover, according to Mr. Cooke, "any other
available property within the permitted zone and the gap in
coverage will not be able to host a tower without a waiver from

9

the fall zone requirement." Cooke Affidavit at para. 11 (emphasis supplied). That evidence is unrebutted.

In the fall of 2020, GMR applied to the Planning Board for site plan review approval, as well as the conditional use permit seeking to increase the permitted height of the monopole from 100 feet to 120 feet. It also sought three waivers from provisions of the Ordinance, only one of which is currently at issue: a waiver from the fall zone requirement. In support of its requested waiver from that requirement, GMR submitted a letter from Greenside Ink, owner of the property on which the monopole would be constructed. In it, Greenside Ink explained that it was aware of the fall zone requirement and the presence of its commercial building within that zone, and expressly consented to the waiver of that requirement. See Letter from Donald Landry on behalf of Greenside Ink, LLC (document no. 13-2) at 23.

GMR also submitted a stamped engineering report which explained that the monopole would be designed so, in the unlikely event of a tower "failure," it would "buckle" at a pre-determined height at or above 75 feet. That "failure" point would be created by over-engineering the monopole below that height. Thus, if the monopole were to experience unanticipated

stresses, it would simply bend or deflect at that pre-designed

point.  The engineer's report explained this in greater detail:

> Failure of a steel monopole occurs when a point is
> reached where the induced stresses exceed the yield
> strength of the material.  At this point, the
> deflections induced in the material are no longer
> temporary.  Hence, a permanent deflection in the
> monopole would exist.
>
> The term failure above refers to local buckling at a
> designated point on the pole.  Local buckling does not
> cause a free falling pole; rather it relieves the
> stresses from the pole at this location.  Monopoles
> are flexible, forgiving structures, which are not
> generally susceptible to damage by impact loads such
> as wind gust or earthquake shocks.
>
> When local buckling occurs, a relatively small portion
> of the shaft distorts and "kinks" the steel.  When the
> pole begins to bend the exposure area is reduced and
> therefore, the force due to wind is decreased as well.
> Even though buckling exists, the cross section of the
> pole is capable of carrying the entire vertical load.
> Therefore, wind induced loads could not conceivably
> bring this type of structure to the ground due to the
> excellent ductile properties, design criteria, and
> failure mode.

Engineering Report of Valmont Structures (document 13-2) at 7

(emphasis supplied).


The engineer's report goes on to state that, "Valmont has

provided structures that have performed well during earthquakes

in California, hurricanes in the South (including Hugo, Andrew,

Opal, and Katrina), and a number of tornadoes.  In over 25 years

of engineering and fabricating thousands of monopoles, to our

knowledge Valmont has never experienced an in-service failure of a communication pole due to weather induced overloading, even though, as in the cases of Hurricanes Hugo, Andrew, and Katrina, the wind speeds exceeded the design wind speed."  Id. at 7.

Aside from the unsupported and speculative opinions/concerns expressed by some members of the Planning Board, there is no evidence in the record that the monopole tower GMR proposed to construct presented any danger of toppling onto nearby people or structures.  Nor, indeed, is there any evidence in the record suggesting that a monopole of that sort has ever failed and caused damage to anyone or anything on the ground, in New Hampshire or elsewhere.

The first public hearing on GMR's application was held on October 14, 2020.  At that hearing the Planning Board voted that the application was "complete" and opened the hearing to the public.  Members of the Planning Board as well as the general public identified several "viewshed areas" they were concerned about.  That is, they wished to know whether the proposed tower would be visible from various scenic vistas in the area. Accordingly, GMR enlisted the services of A&D Klumb Environmental ("ADKE") to conduct a "balloon test" (ADKE also

prepared the National Environmental Policy Act ("NEPA") report
for the proposed tower site).

The balloon test was conducted on October 31, 2020, after
nearly all of the leaves had fallen from deciduous trees.
Accordingly, it presented the "worst case scenario in terms of
visibility" of the proposed tower.  Comments of Peter Cooke,
Minutes of November 11, 2020 Planning Board Meeting (document
no. 13-6) at 40.  The test involved inflating two, four-and-one-
half-foot diameter, helium-filled balloons.  The first (red)
balloon was raised to an elevation of 120 feet above ground
level at the proposed site of the wireless facility.  The second
(orange) balloon was raised to an elevation of 100 feet.  The
balloons were in the air from 7:30 am to 1:00 pm.  The winds
were calm and the sky was clear and sunny.  Numerous photographs
were taken of the balloons to show the proposed tower's
visibility from various viewing areas.  ADKE reported that those
viewing areas included:

> portions of Route 3, Interstate 93 northbound and
> southbound, the entrance to the Flume Gorge, The
> Basin, Lafayette Campground, Boise Rock, Indian Head
> Resort and Tower, Whale's Tail Water Park - top of the
> north slide, Days Inn Motel, Inn of Lincoln Motel and
> Woodward's Resort, as well as 4 Broken Arrow Road and
> 11 Broken Arrow Road.  These locations are shown on
> the included viewshed survey map and photographs from
> each are included.

ADKE Summary of Results of Balloon Test (document no. 13-3) at
10.

Audra Klumb of ADKE described the process and outcome of
the balloon test as follows:

> As part of the NEPA process, a party is required to
> have the project reviewed by the New Hampshire
> Division of Historical Resources.  Attached to the
> draft NEPA checklist were the comments by the State
> Historic Preservation Office ("SHPO").  See Exhibit 1.
> SHPO stated that:
>
>> The project is located within the Franconia Notch
>> cultural landscape - a large district determined
>> eligible for listing in the National Register of
>> Historic Places.  However, the proposed tower
>> does not appear to visually impact the resource
>> and the DHR [Division of Historic Resources}
>> concurs with [ADKE's] finding of No Historic
>> Properties affected.  Please contact the DHR
>> immediately should public concern be raised
>> regarding impacts to historic properties.
>
> ADKE conducted the balloon test for this project on
> October 31, 2020 and prepared the viewshed survey
> dated November 4, 2020.  I was personally involved
> with the test and personally prepared the survey.  A
> copy of the viewshed survey is attached to this
> affidavit as Exhibit 2.
>
> Following the balloon test and in accordance with
> SHPO's comment, on November 24, 2020 I submitted the
> viewshed survey to SHPO, along with copies of public
> comments regarding visibility following the balloon
> test.  A copy of the November 24 submission is
> attached to this affidavit as Exhibit 3.  As part of
> that submission, and due to the limited visibility of
> the proposed tower within the Franconia Notch Cultural
> Landscape, I recommended a finding of no adverse

> effect on historic resources within the "APE," or area
> of potential effect.
>
> By response dated December 15, 2020, <u>SHPO agreed and
> found "No Adverse Effect</u>."  A copy of the final
> finding from SHPO is attached as Exhibit 4.

Affidavit of Audra Klumb (document no. 13-3) at 1-3 (emphasis

supplied).  <u>See also</u> Request for Project Review by the N.H.

Division of Historical Resources (document no. 13-3) at 53-54.

<u>See generally</u> Email from John Devivo, General Manager of Cannon

Mountain Ski Area (document no. 19-4) (recounting that on

October 31, he hiked in several of the viewshed areas and noted

that the red (higher) balloon was <u>not</u> visible from Artist Bluff;

from atop what once was the Old Man of the Mountain's Forehead

in Franconia Notch; from any point on southbound Franconia Notch

Parkway toward Flume Gorge; from any point at or around the base

of Flume Gorge; from below the height of land at Flume Gorge; or

at the height of land at Flume Gorge.  The only place Mr. Devivo

visited and from which the red balloon was visible was on Route

3, just south of the Flume Gorge exit.[1]

---

[1]     The Town says it "disputes GMR's characterization of the
visual impact of the Tower," Defendant's Opposition Memorandum
(document no. 17) at 2, focusing on Mr. Devivo's observation
that the tower would be "clearly visible from just south of the
Flume Gorge exit (on Rte 3 southbound at Parker's)," <u>id.</u>
(quoting Devivo email).  But, of course, the tower is not
invisible and it will be observable from some locations – such
is the nature of cellular communication towers which rely upon
line-of-sight to other towers and end users and, therefore, must
be somewhat exposed.  <u>See</u> Affidavit of Martin Lavin, at para. 4.

A few days after the balloon test was conducted, on November 4, 2020, the Littleton Courier published an article entitled "Cell Tower Considered Near Flume Gorge."  In it, the Lincoln Town Planner was quoted as suggesting (largely erroneously) that the proposed tower would be widely visible to hikers in the area and would adversely affect the pristine views in Franconia Notch.  The article read, in part, as follows:

> GMR Holdings conducted a balloon test at the Greenside Ink property on Halloween.  However, it's unknown how many people had advanced notice to hike Notch trails and assess its visibility.
>
> Lincoln Town Planner Carole Bont indicated that representatives from the New Hampshire Division of Parks and Recreation wondered if the monopole would be visible from the top of Cannon Mountain.  However, they could not access the ridge line for the balloon test because the tram is not operational at this time. "Every hiker would probably see that cell tower in every spot in the area, including the Flume, the Basin and Artist's Bluff, as well as the Indian Head Resort and other private properties," noted Bont.
>
> The town official continued, "Franconia Notch is the crown jewel of the North Country.  It has unfettered views." . . . .  Bont encouraged hikers, outdoor enthusiasts and residents from other communities to submit public comments at the virtual meeting.

---

The question presented – and largely answered by results of the balloon test, Mr. Devivo's personal observations, and the conclusions of both ADKE and the New Hampshire Historic Preservation Office - was the extent to which it would be observable and whether it would adversely affect a number of scenic views in the area.

Littleton Courier Article (document no. 13-7) at 59 (emphasis
supplied).


Understandably, GMR was not pleased.  Counsel for GMR wrote
a letter to Peter Malia, Town Attorney for Lincoln, in which he
noted, in part:

> Both my client and I are extremely disappointed and
> even shocked by these statements.  First and foremost,
> there are absolutely no views of the tower from the
> Flume, the Basin and Artisan's Bluff.  It is not clear
> from the article when she made the statements, so it
> is possible that she made them before the balloon test
> was held (although in that case, she should have
> withheld comment).  However, the lack of visibility
> from those places should have been obvious to anyone
> looking at a map; indeed, it is why I said at the
> acceptance hearing that GMR was not going to include
> those places in the visual study.  The lack of
> visibility is in fact confirmed by the comments from
> Johanna Lyons, of the New Hampshire Division of Parks
> and Recreation and John M. De Vivo, General Manager at
> Cannon Mountain.
>
> Her statements are not only factually incorrect, but
> also highly prejudicial.  They were made before my
> client has even started its presentation on the
> merits, and before the visual study has been
> submitted.  Ms. Bont's statements, coupled with her
> encouragement that "hikers, outdoor enthusiasts and
> residents from other communities should submit public
> comments" show a bias against this project on the part
> of the Town.
>
> * * *
>
> There is simply no way to undo this damage.  Ms. Bont,
> in her official capacity as Town Planner, disseminated
> factually incorrect and highly damaging information
> before my client has had the opportunity to be heard,
> and further has encouraged a large segment of the

      population to oppose the project based on that
      information.  There is little question that many
      people, probably numbering in the thousands, will read
      that article and form adverse opinions of the project
      based on what she said.

      I have sent a copy of this letter to the Planning
      Board.  Please make this letter and the attached
      article a part of the record.

Letter from Jonathan Springer, Esq. to Peter Malia, Esq.

(document no. 13-7) at 57 (emphasis supplied).


      The next public hearing was on November 11, 2020, at which

GMR formally presented its application, including a detailed

review of the RF report, a discussion of the various sites GMR

considered, and an explanation of the results of the balloon

test.  See generally Minutes of November 11, 2020 Planning Board

Meeting (document no. 13-6) at 30-59.  That hearing was

continued to the December 9, 2020, meeting of the Planning Board

and the final public hearing occurred on January 6, 2021.  At

that final meeting, the Planning Board voted to deny GMR's

entire application: the site plan review, the request for the

conditional use permit, and the request for the waiver of the

fall zone requirement.  A final written decision of the board

was provided to GMR in late January.  See Corrected Notice of

Decision (document no. 13-7) at 25-28.

With regard to its denial of a conditional use permit to
increase the height of the tower from 100 feet to 120 feet, the
Planning Board stated:

> Of note, however, the applicant indicated that they
> could obtain the same coverage with a 100-foot tower
> on the same property atop a nearby knoll.  That was
> one of the reasons why the Planning Board found that a
> modification of the Town's 100-foot height limitation
> was not necessary to further the purposes of the
> Town's telecommunications ordinance or to allow for
> the provision of telecommunication service in the area
> of the community affected - the applicant stated that
> they could obtain the same coverage elsewhere on the
> same lot with a 100 foot tower.

Id. at 26.


As an aside, the court notes that GMR has stated that it
would be entirely satisfied if the Town permitted it to
construct the facility on the knoll located on the same lot:
"[I]f the Town truly believes that the Knoll is a feasible
alternative, . . . the Plaintiff will agree to a consent decree
- to be signed by both parties and the Court - granting the
Plaintiff the necessary town permits to put a 100' monopole on
the Knoll."  Plaintiff's Objection (document no. 19-1) at 6.
The Town appears not to have acted on that offer.


In support of its denial of GMR's requested waiver of the
fall zone requirement, the Planning Board stated, among other

things, that "strict adherence to the requirements of the 125%
fall zone requirement was required to effectuate the purposes of
the ordinance" and that "strict compliance with the 125% fall
zone requirement would not create practical difficulty and
unnecessary inconvenience."  Id. at 27.  Finally, the board
noted that "Board members did express significant concerns
regarding the following factors: (a) visual impacts on
viewsheds, ridgeline and other impacts by means of tower
location, tree foliage clearing and placement of incidental
structures and (b) availability of alternative tower structure
and alternate siting locations."  Id.


## Discussion

I.   The "Effective Prohibition" Claim.

The Telecommunications Act provides, in part, that "The
regulation of the placement, construction, and modification of
personal wireless service facilities by any State or local
government or instrumentality thereof . . . shall not prohibit
or have the effect of prohibiting the provision of personal
wireless services."  47 U.S.C. § 332(c)(7)(B)(i)(II).  To
prevail on its "effective prohibition" claim, GMR must
establish: (1) that there is a gap in cellular service coverage
in the area of the proposed tower; and (2) that there are no
feasible alternatives to the site proposed to, and rejected by,

the Planning Board.  See Green Mountain Realty Corp. v. Leonard,
688 F.3d 40, 58 (1st Cir. 2012).  See generally Omnipoint
Holdings, Inc. v. City of Cranston, 586 F.3d 38, 51-52 (1st Cir.
2009) ("The effective prohibition clause does not stand alone;
it is also part of the TCA's larger goal of encouraging
competition to provide consumers with cheaper, higher-quality
wireless technology. . . .  The themes in the TCA of promoting
competition in the wireless communications market and of
relatively speedily effectuating the purpose of the Act,
including the elimination of significant gaps, underlie the
determination of feasibility and impose their own constraints.
Just as carriers must present evidence of their efforts to
locate alternative sites, once they have done so there are
limits on town zoning boards' ability to insist that carriers
keep searching regardless of prior efforts to find locations or
costs and resources spent.") (citations omitted).

     As to the first element of GMR's claim, there is no
dispute: a significant cellular service coverage gap exists in
the area of GMR's proposed tower.  See Plaintiff's RF Report
(document no. 13-4) at 7-28.  See also Affidavit of Martin
Levin, Senior RF Engineer (document no. 13-4) at para. 6
("AT&T's existing, on-air sites cannot provide RF coverage to
the gap area due to distance and topography.  AT&T's closest

existing site is 3.1 miles away, at 33 Brookline Road, Lincoln.
The next closest site is in the Town of Woodstock, almost five
miles away.").  Adhering to the notion that one should "trust
but verify," the Town of Lincoln commissioned a radio frequency
report by an independent expert – IDK Communications – which
concluded that "there exist coverage gaps in the Town of Lincoln
for AT&T, specifically in the areas of Route 93 and Daniel
Webster Highway."  IDK RF Report (document no. 13-7) at 65.  The
Town's expert also concluded that, "the proposed site at 749
Daniel Webster Highway at 120 feet provides coverage to the
areas along Route 93 and Daniel Webster highway."  Id.  See also
Defendant's Memorandum in Support of Summary Judgment (document
no. 15-1) at 18 (conceding the existence of a coverage gap).

Next, GMR must show that there are no feasible alternatives
to the location it has proposed for the monopole tower.  That,
says the Town, it has failed to do.  The court disagrees.

According to the Town, the "knoll site" on the Greenside
Ink property is a feasible alternate location.  And,
constructing the tower in that location would allow GMR to
proceed without the need for a conditional use permit to extend
the tower height to 120 feet.  What the Town neglects to mention
is that: (a) there was local opposition to siting the tower in

22

that location; and (b) the Ordinance requires that "Existing mature tree growth and natural land forms on the site shall be preserved to the <u>maximum extent possible</u>."  Ordinance, Section H(4)(c)(iii) (emphasis supplied).  GMR says it has complied with that requirement (and appeased local concerns) by moving the proposed location of the tower off the knoll.  Moreover, contrary to the Town's assertion (<u>see</u> Defendant's Memorandum at para 41), GMR presented evidence that a tower located on the knoll would <u>still</u> require a waiver of the Ordinance's "fall zone" requirement.  <u>See</u> Defendant's Memorandum at 12 (quoting Lincoln Planning Board Meeting Video) (noting that counsel for GMR testified that, "if we move over the 20 to 25 feet and we put up a 100 foot pole, we are still within the 125 percent radius of the building on our site so we would need to ask for the fall zone waiver in any event.").  Indeed, the evidence of record establishes that a tower constructed anywhere on the knoll would require a waiver of the "fall zone" requirement.  <u>See, e.g.</u>, Second Affidavit of Peter Cooke (document no. 19-2) at paras. 2-3.  Locating the tower on the knoll would place it roughly 60 to 70 feet from the Greenside Ink's commercial building.  By comparison, GMR has proposed locating the tower approximately 55 feet away from the commercial building.  <u>Id.</u> at para. 3.

The point is this: given the strong opposition shown by
members of the Planning Board to allowing any waiver of the fall
zone requirement, it is unclear why the Town argues that the
knoll is a viable alternative site (or, perhaps revealingly, why
it has not accepted GMR's offer to construct the tower at that
location).  See generally Planning Board Minutes, November 11,
2020 (document no. 13-6) at 50-51, Comments of Planning Board
Member Beaudin ("He sees that the fall zone, no matter how
collapsible the tower is, could impact those going in and out of
the building.  There is a safety concern there for him.  He does
not know how safety at the site would be addressed.  There may
be no towers that have ever fallen down, but there is always a
first time for everything."); Minutes of December 9, 2020
Meeting (document no. 13-7) at 4 ("Member Paul Beaudin said he
disagreed with the fall zone analysis.  He stated that no one
can ever address every weather event and make a guarantee [that]
the pole will hold up, however, this pole is very close to a
building. . . . Member Beaudin made it clear that this tower
goes against everything he would like to see public safety
wise.") (emphasis supplied).  See also Id., Comments of Planning
Board Member Ehrman.


Next, the Town argues that "GMR itself identifies two
alternative properties on which it could site the monopole."

Defendant's Memorandum in Opposition (document no. 15-1) at 19.
But, in its alternate site analysis summary, GMR explained that,
"Although all three properties are located within the allowed
tower district (GU), the subject property at 749 US Route 3
provided an existing underlying commercial/industrial use, past
tower use on the property, better elevation to limit the
required height of the proposed tower, and a better opportunity
to screen much of the proposed tower installation from
surrounding properties."  Alternate Site Analysis, Exhibit 3 to
Project Narrative (document no. 13-2) at 22 (emphasis supplied).
Given the Planning Board's refusal to allow GMR to construct a
120-foot tower at the proposed site, it is unclear why it would
suggest that an alternate site – at which an even taller tower
would have to be constructed - is viable.  See, e.g., Minutes of
January 6, 2021, Planning Board Meeting (document no. 13-7) at
12 ("Member Beaudin stated that throughout these meetings
members of the general public have expressed a great deal of
concern as to the aesthetics of the proposed tower location.
Further, the FCC does allow for gaps and dead zones.  Therefore,
there is no need to allow a conditional use permit to increase
the proposed cell tower from one hundred feet (100') in
elevation to one hundred twenty feet (120') in elevation.")
(emphasis supplied).

Moreover, one of the sites identified by the Town is a residential home, while the other is a motel.  And, like the site proposed by GMR, both would require a waiver of the fall zone requirement.  <u>See</u> Cooke Affidavit at para. 11.  But, given the Planning Board's reluctance to grant such a waiver for a <u>commercial</u> property, there is no reason to think it would grant such a waiver for either of those sites – both of which provide residence for people, thus exacerbating the professed "safety" concerns.  <u>See, e.g.</u>, Comments of Planning Board Member Beaudoin, <u>supra</u>.  Indeed, one member of the Planning Board suggested that he would not vote to approve a waiver of the fall zone requirement for <u>any</u> tower in proximity to a residence or other place of temporary or permanent habitation.  <u>See</u> Comments of Planning Board Member Ehrman, Defendant's Memorandum in Support of Summary Judgment (document no. 15-1) at 9-10 and 11-12.

As for two additional sites suggested by the Town – 4 Broken Arrow Drive and 11 Broken Arrow Drive – it is plain from the record that the owners of those properties were opposed to construction of a cell tower and neither location was available for GMR to lease.  <u>See generally</u> Plaintiff's Memorandum in Opposition (document no. 19) at 7-9.

Finally, the Town argues that "GMR eliminated land owned by the United States Forest Service or the State of New Hampshire because it stated that they are 'generally unavailable for lease for private use.'"  But, says the Town, both the state and federal government have regulations and policies that permit siting telecommunications towers on those lands.  Defendant's Memorandum in Support at 20.  Thus, the Town vaguely suggests that GMR could have successfully addressed the coverage gap by locating a tower on some unidentified land managed by either the State or the U.S. government.  But, for the reasons set forth in the affidavit of Peter Cooke, GMR reasonably concluded that a site on either state or federal land was not a "feasible option," given the viability of the proposed site at 749 Daniel Webster Highway, which is on private land.

> In my 30 years in the telecommunication industry, I have had occasion to deal with both the State of New Hampshire, regarding state forest land, and the United States Forest Service, regarding federal lands.  It has been my understanding and my experience that both the State of New Hampshire and the Federal Forest Service require an applicant seeking to put a telecommunication facility on state or federal forest land to show that there is no private, nonstate or non-federal land available for the facility.

> I have reviewed the State of New Hampshire Department of Natural and Cultural Resources Policy document attached as Exhibit 18 to the Town of Lincoln's motion for summary judgment.  At page 3 of that policy, it states that DNCR permits use of state-owned land for a telecommunication facility "when no other feasible alternative is available."

Attached as Exhibit 4, is a brochure from the Federal
Forest Service with instructions about how to obtain
permission for such facility.  As can be seen, on page
1 the brochure states that "Normally NFS land is not
made available if the overall needs of the individual
or business can be met on nonfederal lands."  On page
4 it states that an applicant "must first consider
using nonfederal land."  Attached as Exhibit 5 is the
standard application used by the United States Forest
Service for a telecommunication facility on federal
lands.  The application form requires an applicant to
describe "other alternative locations considered" and
why those alternatives were not selected.  (Both of
these documents are available on the internet at:
www.fs.fed.us\specialuses\special_app_process.shtml.)

In this case, for both state and federal lands, GME
would have to disclose that the Town of Lincoln has a
permitted zone, and that the host property at 749 US
Route 3, Lincoln, New Hampshire is available, and fits
all of GMR's and AT&T's criteria.  Based upon my
experience, that disclosure will mean that neither the
state nor the federal government will approve an
application for a telecommunication facility.

Cooke Affidavit (document no. 19-2) at paras. 7-10 (emphasis

supplied).  See also Comments of Attorney Springer, Minutes of

November 11, 2021 Planning Board Meeting (document no. 13-6) at

48 (noting that constructing a telecommunications facility in

either the White Mountain National Forest or Franconia State

Park would present an access issue).  The Town offers no

rebuttal.

    The points are made.  Given the evidence of record, it is

plain that GMR has carried its burden and established that there

is a significant gap in cellular service coverage in the area of
the proposed tower and that there are no feasible alternatives
to the site proposed at 749 Daniel Webster Highway.


II.   The "Substantial Evidence" Claim.

     The Town's denial of GMR's application amounted to an
"effective prohibition," in violation of the Telecommunications
Act.  Consequently, a lengthy discussion of GMR's "substantial
evidence" claim is unnecessary.  It is sufficient to note the
following.


     The Telecommunications Act requires that, "Any decision by
a State or local government or instrumentality thereof to deny a
request to place, construct, or modify personal wireless service
facilities shall be in writing and supported by substantial
evidence contained in a written record."  47 U.S.C. §
332(c)(7)(B)(iii).  "Substantial evidence does not mean a large
or considerable amount of evidence, but rather such evidence as
a reasonable mind might accept as adequate to support a
conclusion."  ATC Realty v. Town of Kingston, 303 F.3d 91, 94
(1st Cir. 2002) (citation omitted).  But, as this court has
noted, "judicial review for substantial evidence is not a
'rubber stamp.'  A town board 'is not free to prescribe what
inferences from the evidence it will accept and reject, but must

draw all those inferences that the evidence fairly demands.'"
New Cingular Wireless PCS, LLC v. City of Manchester, NH, No.
11-CV-334-SM, 2014 WL 799327, at *4 (D.N.H. Feb. 28, 2014)
(quoting Southwestern Bell Mobile Sys. v. Todd, 244 F.3d 51, 59
(1st Cir. 2001) (emphasis supplied)).  See also Nat'l Tower, LLC
v. Plainville Zoning Bd. of Appeals, 297 F.3d 14, 22–23 (1st
Cir. 2002).

Here, the evidence of record established the following
facts:

1. AT&T has a significant gap in cellular service
   coverage in the area surrounding the intersection
   of Interstate 93 and U.S. Route 3 in Lincoln, New
   Hampshire.

2. Given restrictions imposed by the Town's zoning
   Ordinance, the need to locate the tower within
   the existing coverage gap, the distance to
   existing wireless towers, the local topography,
   the need to access public utilities at any tower
   site, and the need for vehicular access to, and
   parking at, the tower site, GMR determined that
   five locations presented viable potential sites
   for the monopole tower.

3. After further investigation, GMR learned that
   owners of two potential sites were unwilling to
   lease space for a tower and two of the three
   remaining sites would require placement of a
   tower in proximity to dwellings.  Consequently,
   GMR eliminated all but one as a genuinely viable
   site for the tower.

4. The location proposed by GMR for its
   communications facility is within a zoning

30

district in which new tower construction is permitted.

5.  Although the monopole tower would be constructed within approximately 55 feet of a commercial building on the site, it could be engineered in such a way that it would not topple over.  Rather it would "buckle" or "deflect" at a height of approximately 75 feet AGL.  Consequently, it would not present any realistic danger to people or buildings in the area.

6.  If a 100 foot tower were constructed a very short distance away on the knoll, it would have the same (or nearly the same) elevation above sea level as a 120 foot tower constructed in the location proposed by GMR (and presumably be equally visible from various locations as the 120 foot tower proposed by GMR).

7.  If the tower were constructed on the knoll (60 to 70 feet from the location proposed by GMR), GMR would still need a waiver from the Ordinance's "fall zone" requirement.

The Town's written decision to deny GMR's request for a conditional use permit to exceed by 20 feet the 100-foot height limit imposed by the Ordinance was not supported by substantial evidence.  The Ordinance provides that:

Any height limit imposed by this section may be decreased or increased by the Planning Board by approval of a conditional use permit if the Board affirmatively finds (a) the intent of the ordinance will be preserved, (b) a modification is reasonably necessary and appropriate to further the purposes of this article; and (c) a modification is necessary to allow for the provision of telecommunications service in the area of the community affected which can [not] otherwise be effectively serviced.

Ordinance at Section F(4).  See also Id. at Section I(3)
(listing factors to be considered in acting upon an application
for a conditional use permit).

Here, the Planning Board based its denial of a waiver of
the "fall zone" requirement, at least in part, on its conclusion
that, "'strict adherence to the requirements of the 125% fall
zone requirement was required to effectuate the purposes of the
ordinance' and that 'strict compliance with the 125% fall zone
requirement would not create practical difficulty and
unnecessary inconvenience.'"  Corrected Notice of Decision
(document no. 13-7) at 26 (quoting the Ordinance).  Although it
mimics the language of the Ordinance quoted above, that aspect
of the Planning Board's decision is almost entirely unexplained
and at odds with the great weight of the evidence of record, as
well as "those inferences that the evidence fairly demands."
New Cingular Wireless, 2014 WL 799327, at *4.

Additionally, the Planning Board stated that, "Board
members did express significant concerns regarding the following
factors: (a) visual impacts on viewsheds, ridgeline and other
impacts by means of tower location, tree foliage clearing and
placement of incidental structures and (b) availability of
alternative tower structure and alternate siting locations."

32

Again, that aspect of the Planning Board's decision is almost
entirely unexplained.  Indeed, the opinions of those board
members are inconsistent with the record evidence and the
governing law.  See, e.g., Comments by Board Member Beaudin,
supra, concerning the FCC's "allowance" of gaps and dead zones.
The balloon test demonstrated that a 120-foot tower at the
proposed site would have minimal visual impact.  "Tree foliage
clearing" would be minimized by constructing the tower in GMR's
proposed location, rather than atop the knoll.  And, there is no
suggestion in the record of any "alternate siting locations"
that would meet GMR's technical requirements and were available
for lease and would satisfy the Planning Board's criteria,
particularly given members' expressed opposition to any waiver
of the fall zone requirement (which all other viable sites would
require).

Given the state of the evidentiary record, the court is
constrained to conclude that the Planning Board's written
reasoning for its denial of GMR's application is not supported
by substantial evidence.

**Conclusion**

For the foregoing reasons, as well as those set forth in GMR's various memoranda, the court holds that the Town of Lincoln's denial of GMR's application to construct a 120-foot monopole cellular communications tower at 749 Daniel Webster Highway (U.S. Route 3) amounted to an effective prohibition of the provision of wireless services in the area, in violation of 47 U.S.C. § 332(c)(7)(B)(i)(II).  Moreover, the Planning Board's written decision explaining that denial was not supported by substantial evidence, in violation of 47 U.S.C. § 332(c)(7)(B)(iii).  Plaintiff's Motion for Summary Judgment (**document no. 13**) is, therefore, granted.  Defendant's Motion for Summary Judgment (**document no. 15**) is denied.

In this case, as "in the majority of cases, the proper remedy for a zoning board decision that violates the" TCA is an order "instructing the board to authorize construction." National Tower, 297 F.3d at 21–22.  Such an order is warranted here in order to avoid "multiple rounds of decisions and litigation," id., and because a remand to the Board would "serve no useful purpose," Brehmer v. Planning Bd. Of Town of Wellfleet, 238 F.3d 117, 120 (1st Cir. 2001).  Accordingly, the Town of Lincoln Planning Board shall promptly issue all necessary permits and approvals and authorize construction of

the tower as proposed at 749 Daniel Webster Highway (U.S. Route 3).

       **SO ORDERED.**

                             _____

                             Steven J. McAuliffe
                             United States District Judge

November 8, 2021

cc:  Jonathan S. Springer, Esq.
     Russell F. Hilliard, Esq.
     Brooke Lois Lovett Shilo, Esq.